Stuart S. WYKLE and Myrtle L. Wykle, Plaintiffs-Appellants,

v.

Mary E. COLOMBO, Defendant-Respondent.

No. 54408.

Supreme Court of Missouri, Division No. 1.

Sept. 14, 1970.

Meyer, Traeger & Fletcher, William J. Fletcher, John B. Gray, Clayton, for plaintiffs (appellants).

Charles A. Lee, Jr., Clayton and Marvin Boisseau, Jr., St. Louis, for defendant (respondent).

GEORGE P. ADAMS, Special Judge.

The parties own adjoining tracts of land on the east bank of the Meramec River in St. Louis County; plaintiffs-appellants on the south and defendant-respondent on the north.

In this action plaintiffs seek to establish title by adverse possession to land lying north of the property to which they hold record title and west and south of the north bank of "Indian Creek." "Indian Creek" crosses the common record boundary between the tracts several hundred feet east of the Meramec and meanders in an arc north, northwest, west, and southwest to the river.

Defendant by answer and counterclaim sought an adjudication of title to the same property and for damages for trespasses allegedly committed by plaintiffs.

There is no controversy as to the location of the common record boundary between the tracts or that the disputed area lies entirely within the property to which defendant holds record title.

In 1922 a survey was made by an "Elbring Surveying Company" locating defendant's land. The south line of her property and the north line of plaintiffs' property was described by metes and bounds using degree and minute variations and lineal measurements in feet. It does not appear whether or not this survey was recorded.

On March 1, 1941, plaintiff Myrtle L. Wykle was the wife of C. H. Beatte. On that date, she and her husband and plaintiff Stuart S. Wykle took title to the property to which plaintiffs hold record title and entered into possession thereof. The description of the north line of the property followed the identical description used in the Elbring Surveying Company's survey made in 1922 and concluded, "containing 8.958 acres, as per Survey of Richard Elbring, Surveyor."

In 1942 Mr. Wykle executed a deed to the Beattes conveying an one-half interest in the land. In 1947 the Beattes executed a deed conveying an one-third interest to Mr. Wykle. In June of 1951 the Beattes executed a deed to one Mae Dennington, a "straw party." In July 1951 Mae Dennington executed a deed to Myrtle L. Beatte. All of these deeds contain the identical description used in the deed of March 1, 1941.

In the spring of 1952 C. H. Beatte and Myrtle L. Beatte were divorced. Later that year Myrtle L. Beatte married Stuart S. Wykle.

On December 2, 1963, Myrtle L. Wykle executed a deed to Myrtle L. Wykle and Stuart S. Wykle and, with one error not material here, again used the identical description contained in the 1941, 1942, 1947, and two 1951 deeds. She testified that she intended to convey *"all the land"* she owned by this deed.

None of these conveyances made any mention of the disputed area.

In June 1963 plaintiffs filed a suit against Charles Colombo, defendant's son and tenant. In their petition they alleged that they were the owners "of the following described real estate", setting forth a description locating the north line of their property the same as found in the Elbring Surveying Company's survey and the deeds heretofore referred to, and concluded, *"containing 8.958 acres."* In this suit they made no claim of ownership to the disputed area. They sought to have Charles restrained from continuing certain acts of nuisance and trespass and that he be enjoined and restrained from entering "upon the plaintiffs' above described lands." This suit was dismissed.

In 1941 the property to which defendant has record title was owned by one Paul F. Gutman. On July 15, 1955, he and his wife conveyed this land to Oreste Joseph Colombo using a description following the Elbring Surveying Company's survey made in 1922 in which the common boundary between the parties' land was identical to that used in the 1941, 1942, 1947, 1951, and 1963 deeds mentioned earlier herein.

Shortly after the date of his deed, Oreste Colombo was killed. The defendant, his mother, acquired title to the land by inheritance and deeds from Oreste Colombo's heirs. Defendant, as owner, and her son Charles, as her tenant, entered into possession of her land. Charles Colombo died in 1964. Defendant remains in possession.

In the instant action the trial court found that plaintiffs had no right, title or interest in the land to which defendant held record title (which, of course, included the disputed area) and also awarded defendant One Dollar on her counterclaim for damages.

Since 1941, accretions have formed and extended the western boundaries of the parties' land.

No formal description of the disputed area has been furnished and it can be determined only by reference to "Indian Creek" as set out on a survey, an exhibit attached to plaintiffs' petition and introduced in evidence.

■ A motion to dismiss the appeal for failure to comply with Civil Rule 83.05(a) (2), and 83.05(a) (3), V.A.M.R., and because the petition fails to state a claim upon which relief can be granted, was taken with the case. While appellants' brief fails to comply with Rule 83.05(a) in some respects, "it is the policy of this court to decide cases on the merits when reasonably possible." Martin v. O'Connor, Mo.Sup., 406 S.W.2d 41, 42 [2]. It is reasonably possible to do so here.

■ As her third ground for dismissal of the appeal, respondent contends that the area in dispute cannot be identified from the petition and an exhibit attached to it. The petition and said exhibit located plaintiffs' north boundary, Indian Creek and the Meramec River with sufficient definiteness that "anyone competent to survey land could with the description" in the petition and the exhibit attached "with certainty locate the land." Keator v. Helfenstein Park Realty Co., 231 Mo. 676, 132 S.W. 1114, 1115; Hartvedt v. Harpst, Mo.Sup., 173 S.W.2d 65, 69.

The motion to dismiss the appeal is denied.

Except for a small strip along the bank of the river existing in 1941 which plaintiffs claim they kept cleared and mowed, most of the evidence deals with the actions of the parties on the area that has been added by accretion since 1941 and shall be referred to as the "front." The rest of the area is wooded and not cleared as the accreted area. It is not suitable for cultivation. It will be referred to as the "back."

Plaintiffs' property is known as "Riverside Forest." Its improvements consist of a residence, a combination garage, pumphouse and utility shed (referred to as the "frame" building), and eight frame guest cottages. These cottages are leased on an annual rental.

From the evidence most favorable to plaintiffs it could be found that from time to time since 1941 they and their guests have used the front for sunbathing, boating, fishing, swimming, tying up boats, and as access to the river; that they have cut trees, cleaned up and burned debris, planted castor beans, planted grass, mowed it once a week from April to October, and kept it clean; that they built a small dock at the river's edge "close to Indian Creek." They put up some "No Trespassing" signs and on occasions ordered trespassers off the area.

On the "back" they built a chicken house about 15 to 17 feet north of the frame house. Mrs. Wykle says it was built in 1946 and remained for about 3 years. Mr. Wykle said it was built in 1946 and stayed until 1955, during which time it was used three years for raising chickens. In 1952 they built a small wading pool north of the line between the residence and the frame building. A water pipe extended 25 feet north of the line and drained water from the pumphouse. A tenant used an area 35 feet north of the frame building as a back yard and "mowed it to the creek." Plaintiffs used this same area to repair screens, make concrete benches, and do repair work. Tenants would dig worms from the area. Some rocks were taken from the creek. During the years and up to the time of the suit plaintiffs cut some 20 trees, including 3 or 4 large ones, from the entire disputed area which were used for firewood. During the time the Gutmans were in possession they crossed over "a part of the area" to get to the river. Other than that, they made very little use of it.

From the defendant's evidence it could be found that when Oreste Colombo took possession in 1955, the entire area, except for a small strip immediately adjoining the river, was wooded, grown up in weeds, underbrush, timber, scrub timber, trees, shrubbery, vines, growths with thorns, and

"looked like a jungle." In 1955, for about 10 feet south of the creek, Oreste cleaned up some of the area. He removed some old trees (some as close as 50 feet from plaintiffs' residence), willows, large trees, and "stuff that the river had put in there at different times." A tractor and a power chain saw were used. No "No Trespassing" signs were seen. In 1958 Charles hired a contractor to do some bulldozing about 30 feet on each side of the creek or "swag" and in the creek which took 30½ hours and cost $610.00. In 1959 Charles mowed the grass with a "big" tractor and mowing equipment on the front area. In 1959 and 1960 Charles used part of the front area for a garden. In 1961 he plowed a strip of the front area. In 1962 he plowed the whole front area for about 125 feet south of the creek and a tenant of defendant raised a garden from spring until September. In 1963 Charles plowed closer than 30 feet from plaintiffs' residence. In 1963 he built a dock. Later plaintiffs tore it down and burned the wood. He also put up some steel posts filled with concrete which plaintiffs later removed.

A tenant of plaintiffs from 1960 to 1966 never saw Mrs. Wykle use the plowed ground. Never during the use of the bulldozer, the numerous times a tractor and a power chain saw were used by Oreste and Charles, nor during the construction of the dock or the erection of the steel poles that were filled with concrete, did either plaintiff tell anyone to stop or to get off the property south of the creek. Several persons, defendant's relatives and a stranger, talked to Mrs. Wykle and she never told any of them that she claimed to own the disputed area.

As best that can be determined from the plat or survey attached to plaintiffs' petition showing the meandering of Indian Creek, its north bank is about 107 feet north or back of the frame house; about 127 feet north of the residence, and 175 feet north of a point about midway between the residence and the frame house.

The northeast corner of the frame house extends 1¾ feet north of the north line of plaintiffs' property. A fence running from the northeast corner of the residence (which is directly on plaintiffs' north line) extends eastward and to a point 4 feet north of plaintiffs' north line. Defendant and her predecessors in title paid all the taxes on the disputed area. Plaintiffs never paid any taxes nor did they ever request that the area be assessed to them.

■ We are, of course, required to review this case "upon both the law and the evidence." We should not set aside the judgment unless "clearly erroneous." Due regard shall be given to the "opportunity of the trial court to judge of the credibility of the witnesses." Civil Rule 73.01(d), V.A. M.R.

The record in this case requires that particular deference be accorded the trial judge's findings because of his opportunity to follow descriptions on and references to 39 photographic exhibits, and especially defendant's Exhibit "R".

Notwithstanding the capable trial judge's repeated admonitions to identify on the photographs admitted in evidence the numerous references to "here", "over there", "across here", "one right here", "over here in front of this", "more like a circle", "all of this area", "this here", "like so", "the clearing", "down in this area", "something on the order of this", "some more boats up here", "here's one", "coming along down here", "this fence", "all in this area", "this line of trees", "mostly over here up further", the exhibits were not marked to show these references. We are completely at a loss to understand what a witness had reference to in many instances. The trial judge, however, could see where the witness was pointing or indicating and, of course, understand such testimony and evidence.

■ Defendant's Exhibit "R", a 16″ x 18″ aerial photograph, was lost and is not before us. This exhibit was used in the

examination of 15 witnesses. It was marked at 6 different places with "X's", "circles", a "squared off area" and with initials. It was referred to 69 times in the testimony. It was mentioned 4 times in the trial court's findings of fact. In the absence of such an apparently important exhibit, it must be presumed that its contents "were favorable to the judgment entered and unfavorable to the appellant," Bryan v. Bryan, Mo. App., 452 S.W.2d 293, 295 [1]; the intendment and content will be taken "as favorable to the trial court's ruling and as unfavorable to appellant," Lange v. Baker, Mo.App., 377 S.W.2d 5, 7 [4]; Fuzzell v. Williams, Mo.App., 288 S.W.2d 372, 373 [2].

■ To sustain an effective claim of adverse possession "the possession must be hostile and under a claim of right, actual, open and notorious, exclusive, and continuous; and the burden of proving these five elements and their concurrent existence for ten years prior to commencement of the action to perfect title is on the party claiming title by adverse possession." Miller v. Warner, Mo., 433 S.W.2d 259, 262 [1], and cases cited. "Whenever any of these elements is lacking, no title by adverse possession can ripen." Eaton v. Curtis, 319 Mo. 660, 4 S.W.2d 819, 822 [3], Moss v. James, Mo., 411 S.W.2d 104, 107 [1].

In his findings of fact, supported by substantial evidence, the trial judge found, inter alia, that the portion of the disputed area directly south of Indian Creek which was "encircled by a red marking" on defendant's Exhibit "R" was "covered with shrubs, trees and undergrowth and was not cleared by anyone until the year 1958"; that after the Meramec receded, plaintiffs cleared the "accreted area" south of the "overgrown area (encircled by a red line on Exhibit R)" and continued to keep it clear "from 1945 on."

As we have indicated, we cannot know how much of the "accreted area" is south of said "overgrown area." On a plat introduced in evidence, the original bank of the Meramec River was marked and if the entire area from its original bank to the present bank was included in the accreted area south of the overgrown area, it would constitute only an half or a little more of the entire tract which plaintiffs claim by adverse possession.

A number of witnesses testified that the area encircled in red on Exhibit "R" was accreted land. Under this evidence, then, the part south of the "overgrown area (encircled by a red line on Exhibit R)" which plaintiffs kept clear would constitute an even smaller fraction of the disputed area.

As to the "back" of the disputed area, the distances from plaintiffs' north boundary line to the "north bank of Indian Creek" (to which plaintiffs' petition seeks to establish title) ranges from 107 feet to 175 feet to 127 feet. With the exception of plaintiffs' cutting a few trees for firewood and a tenant digging worms and getting rocks out of the creek, the uses to which plaintiffs put the "back", and their actual or constructive possession of it, was limited to areas not over 35 or 40 feet north of their line. Their claim of possession to the remaining $\frac{2}{3}$ to $\frac{3}{4}$ of the area to the north bank of Indian Creek (ranging from approximately 67 feet to 135 feet) was not "evidenced by occupation, clearing, farming, pasturing and erecting improvements" thereon, as was in Miller v. Warner, supra, 433 S.W.2d, p. 263 [3]. Plaintiffs proved neither actual nor constructive possession of this remaining area.

■ Plaintiffs did not sustain their burden of proof to show that they had been in the "actual" possession of the entire disputed area. One of the essential elements lacking, no title by adverse possession can ripen.

■ Plaintiffs' complaint that the trial court erred in finding for defendant on her counterclaim is groundless. As already made apparent, there was evidence that defendant owned the disputed area and that in tearing down a boat dock and the steel

and concrete poles, plaintiffs damaged defendant in an amount of at least $1.00.

■ Plaintiffs also claim that the court should have "apportioned between the parties the accreted area to the west of their respective boundaries." While the plaintiffs' petition and the exhibit attached to it might be sufficient from which the boundaries of the area to which they claim by adverse possession (Indian Creek and the Meramec River) could be determined by someone "competent to survey land," they do not contain sufficient information as to distances and course variations from which the court can by a decree "apportion" the accreted area. The trial court did not err in failing to make this finding.

The judgment and decree is affirmed.

SEILER, P. J., and HOLMAN, J., concur.

BARDGETT, J., not participating because not a member of the Court when cause was submitted.